Filed 2/6/15  P. v. Ortiz-Calderon CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOSE RAMON ORTIZ-CALDERON,<br><br>     Defendant and Appellant. | A138987<br><br>(Sonoma County<br>Super. Ct. No. SCR604250) |

BY THE COURT:

It is ordered that the opinion filed herein on January 20, 2015, be modified as follows:

On page 8, in the last full paragraph, the last sentence and citation are deleted: " ' "Instructions . . . 1088.)"

This modification does not effect a change in the judgment.  The petition for rehearing is denied.

Dated:_____                        _____
                                                                          Miller, J.

1

Filed 1/20/15  P. v Ortiz-Calderon CA1/2 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE RAMON ORTIZ-CALDERON,<br><br>Defendant and Appellant. | A138987<br><br>(Sonoma County<br>Super. Ct. No. SCR604250) |

## INTRODUCTION

In the early morning hours of June 23, 2011, Jose Ramon Ortiz-Calderon (defendant) accused his then girlfriend of sleeping with other men.  He became so enraged that he insisted on keeping her car keys and cell phone so that she could not make contact with other men.  She left defendant's house and walked back to her house, a few doors away.  Several hours later, when she went back to pick up her keys and cell phone, defendant became enraged again, screamed at her, and called her names.  He followed her into the bathroom where he slapped her, pulled off her shorts and ripped off her underwear, forced her to the floor and up against the wall, and forcibly sexually penetrated her vagina with his fingers.  She was eventually able to leave the bathroom, and, soaking wet and crying hysterically, went back to her house where her mother called 911.  A sheriff's deputy arrested defendant later that morning after he was found hiding in his bedroom closet.

1

Defendant was charged with two counts of forcible sexual penetration in violation of Penal Code section 289, subdivision (a)(1)[1] (counts 1 and 2); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)) (count 3); and felony false imprisonment (§ 236) (count 4). He was convicted by a jury of all counts except count 2. Defendant was sentenced by the court to six years in state prison.

Defendant now raises several claims of error. As to the jury instructions, he contends the trial court erred by not giving his proposed special instruction on the specific intent element of the offense of sexual penetration by force; by instructing the jury with CALCRIM No. 1045, which he alleges incorrectly defines "[p]enetration for *sexual abuse*;" and by giving a jury instruction on flight (CALCRIM No. 372) which is argumentative and favors the prosecution. As to the false imprisonment conviction, defendant claims the evidence was insufficient to convict him because there was no evidence that the victim was prevented from leaving the bathroom, but that in any event, the trial court should have stayed his sentence on that count pursuant to section 654, because the forcible restraint was for the single objective of the sexual assault. Finally, defendant contends a domestic violence protective order that has already expired must be set aside because it was statutorily unauthorized. For the reasons set forth below, we will modify the judgment to stay the sentence for false imprisonment and affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

In late June 2011, defendant and Megan Differding[2] had been dating for about three months. They lived a few houses down the street from each other.

Differding spent the evening of June 22, 2011, with defendant, first at his house, where they watched television and smoked marijuana, and then at the home of one of

---

[1] All statutory references are to the Penal Code.

[2] Differding was originally identified as Jane Doe in the information. She later expressly requested that she be referred to by her given name, as reflected in the Amended Information.

2

defendant's friends, where Differding drank a 24-ounce bottle of beer and smoked more marijuana. Defendant drank beer.

Differding's Testimony

Differding and defendant returned to defendant's house around 2:00 a.m. Differding wanted to go back to her own home to sleep because she had to work the next day. Defendant became angry with her and accused her of sleeping with other men. They argued, and defendant insisted on keeping Differding's car keys and cell phone so she could not use them to go out with another man that evening. Differding left her keys and cell phone behind and walked home.

About 8:00 a.m. that morning, Differding walked back to defendant's house to retrieve her belongings. A man she did not know opened the door and let her in. She went into defendant's bedroom, where he again accused her of going out with another man. They continued arguing, and defendant refused to return her cell phone and car keys. She started to cry and went into the bathroom to get away from defendant and for some privacy.

Defendant entered the bathroom "in a rage." He screamed insults at her, calling her a "slut," a "whore," and "bitch." He slapped her face repeatedly and pushed her to the floor. She yelled at him to stop, but he lay on top of her and pinned her down. He reached inside her shorts and "shov[ed]" his fingers so far into her vagina that it "felt like [they were] in [her] stomach." She could tell it was more than one finger "[b]ecause it hurt so bad." He withdrew his fingers after a few seconds and held his hand up to her face, ordering her to smell his fingers. He slapped her face again.

Differding testified that she was eventually able to get up, but defendant pushed her again. She fell backwards into the bathtub and hit her head on the faucet, which caused the water to turn on. She struggled to stand up, and defendant pinned her against the wall with his arm across her throat. Differding resisted, but defendant pulled off her shorts and then ripped off her underwear. She was having trouble breathing because of the pressure against her throat. While he had her pinned against the wall with his forearm across her neck, defendant again pushed his fingers into her vagina. Differding was

3

screaming, " 'Stop, stop, stop, stop,' " and he "finally stopped." She was on the bathroom floor, trying to protect herself, and he was standing over her, breathing hard, as though "he was so tired he couldn't hit me anymore, or struggle with me."

Differding grabbed her keys and phone, ran out the front door, and drove her car, which had been parked in front of defendant's house, back over to her house. She told her mother defendant had beaten her up. Differding threw up in the sink and had to lie down because her head and neck hurt so badly. Differding's mother called the police.

Differding testified that it hurt to go to the bathroom for about a week, and that her entire upper body was sore for several months. She lost her job because she could not lift anything weighing more than 10 pounds.

On cross-examination, Differding acknowledged that she testified she had nothing to drink at defendant's friend's house when, in fact, she drank a 24-ounce bottle of beer. She also acknowledged that she had used cocaine some 30 hours before the assault. Differding admitted that she had given conflicting statements as to the number of times that defendant had penetrated her vagina with his fingers. Shortly after the incident, she told a sheriff's deputy she had been penetrated two or three times. At the preliminary hearing, she first estimated three or four times, and later stated, " '[p]robably more than five times.' "

Differding also admitted that in 2005, when she was in the eighth grade, she told her mother that she had been kidnapped by two men, but that this was a lie; she "had ditched school that day" and did not want to get in trouble. When the police questioned by her about the allegation at the time, she admitted she had not been kidnapped.

Differding also acknowledged that she stole a bottle of tequila from a market in September 2012.

Other Prosecution Witnesses

Differding's mother, Gayle Differding, testified that Differding seemed irritated about having to pick up her keys and cell phone at defendant's house on the morning of the incident. When Differding returned home a short time later, she was crying hysterically and her clothes were wet. She told her mother, " 'He beat me up.' " Gayle

4

Differding called 911. She could hear her daughter vomiting in the bathroom, and she later saw vomit in the toilet bowl. She heard her daughter tell paramedics that defendant "had pushed her into the bathtub, and that he had held her down, that he had pushed her shorts aside, and had rammed his hand up her vagina."

Sonoma County Sheriff's Deputy Blake Hulquist testified that Differding was bleeding from the mouth, had injuries to her chest, and was crying and hyperventilating when he arrived at the house in response to a dispatch call.

Deputy Tim Rountree testified that he spoke with Differding while the paramedics were getting her ready to be taken to the hospital. Differding told Rountree that defendant had taken her keys the night before because he suspected her of sleeping with other men. Differding went back to defendant's house earlier that morning to get her keys, and defendant attacked her in the bathroom. She told Deputy Rountree that defendant slapped her, then pushed her into the bathtub, ripped off her shorts, and inserted his fingers into her vagina. He smelled his fingers and "asked her who she had been fucking." Differding said defendant "smashed her head into the bathtub, and again assaulted her, slapped her some more."

A firefighter paramedic who responded to the scene testified that Differding was crying and upset. She told him that she had been assaulted by her boyfriend. She said defendant struck her in the head and pushed her down, and she hit her head and neck in the bathtub. She also "reported that he had ripped off her underwear and stuck his fingers into her vagina." Differding complained of back and neck pain from having hit her head during the fall. She was taken by ambulance to the hospital. En route, her blood pressure was elevated and the paramedic administered morphine for pain.

Differding was examined by an emergency room physician and a sexual assault response team (SART) nurse. She complained of hoarseness and pain to her head, neck, throat, arm, and vaginal area. A CAT scan and x-rays revealed no broken bones or serious injuries, but there was bruising to her throat, voice box, and thyroid cartilage, and nerve injury to her arm. The examining doctor opined that her symptoms were

5

"anatomically consistent" with her description of what had happened; it "made sense physiologically."

The SART nurse saw multiple bruises on Differding's neck and arms, a two-inch abrasion on the back of her leg, and "a pretty significant abrasion" on her scalp. The nurse also saw signs of trauma to Differding's vaginal region that were consistent with repeated penetration by a hard object. The nurse noted a laceration with abrasion, torn skin, and petechiae (bleeding underneath the skin) on the left and right labia minora. The nurse could not say whether Differding's vaginal injuries were the result of consensual or nonconsensual sexual activity. (Differding testified that she and defendant had consensual sexual intercourse while dating; the most recent time before the assault might have been two nights earlier.)

<u>Defendant's Arrest and Statement to Law Enforcement</u>

After speaking with Differding, Deputy Hulquist walked to defendant's house. Defendant was not there. While searching the house, Hulquist saw women's underwear in a trash can in the bathroom. Hulquist waited outside the front of the house for a couple of hours. He went back inside the house when he heard some dogs barking in the back, and caught a glimpse of defendant entering a bedroom and going into a closet. Hulquist opened the closet door and found defendant. After a brief struggle, Hulquist arrested him.

Sheriff's Detective Matthew North questioned defendant later that day. The interview was videotaped. After reading defendant his *Miranda*[3] rights and obtaining his waiver, Detective North asked defendant if he had "any idea why you're here?" Defendant responded, "Yeah, I'm pretty sure I do." Defendant told North that he and Differding had been out drinking the night before and got back around 3:30 a.m. He took her keys so she would not drive while drunk. Differding left defendant's house and returned around 7:00 a.m. to get her car keys. Defendant said he was still "really drunk," and they got into an argument in the bathroom. She started calling him names and he

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6

"flipped out" and "overreacted." Defendant was upset because he suspected Differding was having sex with other people. Defendant admitted pulling off Differding's underwear, saying it happened when she fell in the bathtub. He repeatedly admitted penetrating her vagina, and admitted at one point that he knew it was wrong. He also repeatedly stated that he was drunk at the time. Several times during the interview, defendant claimed that he grabbed Differding accidentally when one or both of them slipped on the wet bathroom floor.

Both Detective North and the deputy who collected evidence from under defendant's fingernails noticed scratches and some redness on defendant's face and arms. DNA analysis of scrapings from under defendant's fingernails showed Differding's DNA. A blood sample from defendant tested negative for alcohol.

Defense Witnesses

Clifton Jordan, a friend of defendant's brother Juan, testified that he spent the night of June 22, 2011, on the couch at defendant's house. Jordan let Differding into the house the next morning, and she and defendant immediately started arguing in Spanish. They went into defendant's room and Jordan could hear them arguing. It sounded like a typical "petty argument." He heard doors opening and slamming, and heard Differding say, "stop." He went to the closed bathroom door and "asked if everything was okay." Defendant and Differding both became quiet and defendant answered, " 'Everything's fine. Don't worry about it.' " Shortly thereafter, Jordan went out on the back porch to smoke a cigarette and heard the front door close. When he came back inside, defendant was in the living room and Differding was gone. A short time later, defendant left the house. The police arrived a few minutes later.

A Department of Justice criminalist testified that Differding's June 23, 2011, urine sample tested positive for marijuana, cocaine and a cocaine metabolite, and Vicodin/hydrocodone. The presence of cocaine itself strongly suggested that Differding had ingested cocaine within 12 hours, and not more than 24 hours, of giving the urine sample.

<u>The Verdict and Sentence</u>

On February 26, 2013, a jury found defendant guilty on counts 1 (forcible sexual penetration), 3 (assault by means of force likely to produce great bodily injury) and 4 (false imprisonment), and not guilty on count 2 (forcible sexual penetration).

The trial court sentenced defendant to an aggregate term of six years in state prison, comprising the middle term of six years for count 1 as the base term, and middle terms of three years for count 3 and two years for count 4 (false imprisonment) to run concurrently.

Defendant filed a timely notice of appeal.

## DISCUSSION

I. *Alleged Instructional Errors*

Defendant contends the trial judge made several instructional errors, which we address in turn.

We apply the de novo standard of review to claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Posey* (2004) 32 Cal.4th 193, 218.) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] . . . . "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) A claim that the jury was incorrectly or incompletely instructed requires the reviewing court to determine from the entire charge whether there is a reasonable likelihood that the jury misconstrued or misapplied the instruction. (*People v. Letner* (2010) 50 Cal.4th 99, 182.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Further, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to lighten the prosecution's burden of proving each element of each offense beyond a reasonable doubt. (See *People v. Frye* (1998) 18 Cal.4th 894, 958, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A.      *The Denial of Defendant's Proposed Instruction on Specific Intent*.

Defendant contends the trial court erred and violated his constitutional rights to due process and a fair trial in failing to give a special instruction requested by the defense regarding the specific intent element of the offense of sexual penetration.  He argues this asserted error deprived him of the right to a jury determination of every element of the offense.

Defense counsel requested the following special instruction based on *People v. Senior* (1992) 3 Cal.App.4th 765, 776:  "To be guilty of Count I and Count II, both alleging sexual penetration by force, fear or threats, the defendant must possess a certain specific intent at the time of the alleged commission of the act.  At the time of the alleged act of penetration, *the defendant's specific intent must be the purpose of sexual arousal, gratification, or abuse*."  (Emphasis added.)

The trial court agreed with defense counsel that forcible sexual penetration is a specific intent crime.  However, the court declined to give defendant's requested instruction because "between [CALCRIM] instructions 252 and 1045, that, those concepts that he's requesting on the issue of specific intent are included and discussed."

The court instructed the jury with CALCRIM No. 252, in relevant part, as follows:  "The following crimes require a specific intent or mental state.  And that would be Counts I and II, which is penetration by force, fear, or violence.  For you to find a person guilty of this crime as charged in Counts I and II, that person must not only intentionally commit the prohibited act, but must do so with a specific intent.  *The act and specific intent required are explained in the instruction for that crime*."  (Emphasis added.)

9

The court also instructed the jury with CALCRIM No. 1045, in relevant part, as follows: "The defendant is charged in Counts I and II with sexual penetration by force, in violation of Penal Code Section 289. To prove that the defendant is guilty of this crime, the People have to prove four elements: [¶] One, the defendant committed an act of sexual penetration with another person; [¶] Two, the penetration was accomplished by using a foreign object; [¶] Three, the other person did not consent to the act, and [¶] Four, the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person. [¶] Sexual penetration means penetration, however slight, of the genital or anal opening of the other person *for the purpose*[] of sexual abuse, arousal, or gratification. . . . *Penetration for sexual abuse means penetration for the purpose* of causing pain, injury, or discomfort." (Emphasis added.)

Defendant was charged with a violation of section 289, subdivision (a)(1), which provides in pertinent part, "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment . . . ." Section 289, subdivision (k)(1) defines " '[s]exual penetration' " as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

Defendant argues the denial of the requested instruction deprived him of his right to present his defense theory that his penetration of Differding's genitals was accidental or that he otherwise did not act with the required specific intent. We disagree.

Pursuant to CALCRIM Nos. 252 and 1045, the trial court properly instructed the jury that sexual penetration is a specific intent crime, meaning that the "person must not only commit the prohibited act, but must do so with a specific intent," (CALCRIM No. 252) and that the nature of that intent would be explained in the instruction on forcible

10

sexual penetration. Thereafter, the jury was also told that sexual penetration required a finding that defendant had penetrated Differding "*for the purpose of sexual abuse, arousal, or gratification.*" (CALCRIM No. 1045, emphasis added.) We discern no material difference between committing an act with a specific intent and committing an act for a particular purpose. Together these instructions sufficiently advised the jury of the specific intent required to be convicted of forcible sexual penetration. Defendant's requested instruction, although legally correct, was duplicative of other instructions, and the trial court had no duty to give it. (See *People v. Lucas* (2014) 60 Cal.4th 153, 285 ["A court may refuse a proposed instruction if it is duplicative of other instructions."].)

Moreover, both parties clarified the specific intent requirement in closing argument. The prosecutor argued that defendant's statement to the deputies, "I know it was wrong," was evidence that he intended to abuse Differding. "And that's our theory of the case: That he was trying to degrade and humiliate her, cause her pain, because he felt that she was unfaithful to him." The prosecutor continued, "He's so angry with her that morning, he's so angry, because he so believes that she's cheating on him that, when she's crying in the bathroom, because she can't get her keys and she needs to go to work, he comes in, and he assaults her, and he violates her . . . ."

In turn, defense counsel argued in closing that the specific intent element had not been proven. Setting aside sexual arousal or gratification as inapplicable to this case, defense counsel focused on the intent to sexually abuse: "Well, what is penetration for sexual abuse? What is that? He has to have the specific intent, when he does this thing, penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort. That's the definition in Instruction [CALCRIM No.] 1045. The specific intent that [defendant] would have had to have had is that he performed this penetration for the purpose of causing pain, injury, or discomfort." Based on evidence that defendant had been drinking, defense counsel posited: "What if your sole focus, irrational though it may be, is that you're performing your own exam to prove to this person that you're mad at that she cheated on you? And what if this stupid decision is made because, in part, you're drunk, and you think she's been cheating on you, and you want to demonstrate it?

11

So you try to get some evidence of it. And you therefore, because of your concern about her being unfaithful, exam or not, and your level of intoxication, you have not formed the intent to cause pain, injury, or discomfort, in part due to voluntary intoxication."[4]

Finally, even if we were to agree with defendant that the requested special instruction should have been given, we conclude the error was harmless. Defendant argues we must apply the federal standard of harmless beyond a reasonable doubt in assessing his claim because not giving the requested instruction lightened the prosecution's burden of proving every element of the charged offense beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We disagree. If any error occurred, it consisted of failing to give a legally correct but duplicative instruction. Based on the evidence and arguments of counsel in connection with defendant's claim that he lacked the specific intent for forcible sexual penetration, there is no reasonable probability that the jury would have reached a result more favorable to defendant had the trial court given the requested duplicative instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *People v. Flood* (1998) 18 Cal.4th 470, 490 [applying *Watson* standard to instructional error that does not amount to federal constitutional error].)

B.      *The Alleged Erroneous Jury Instruction Defining Sexual Abuse (CALCRIM No. 1045).*

Defendant contends the trial judge erred by instructing the jury with CALCRIM No. 1045 because it incorrectly defines "[p]enetration for *sexual abuse*" as "penetration for the purpose of causing pain, injury, *or discomfort*." (Emphasis added in second quote.) Defendant contends the intent to cause "discomfort" is insufficient to constitute "abuse" under section 289, and thus the jury was misinstructed on the specific intent element of this offense. The error was prejudicial and likely affected the verdict,

---

[4]  Consistent with defendant's theory of the case, the jury was also instructed, based on CALCRIM No. 3426, that it could consider defendant's voluntary intoxication in deciding whether he "acted with the intent to do the act required."

according to defendant, in light of the weakness of the prosecution evidence that defendant intended to cause Differding significant pain or injury.

The jury instruction given in this case—CALCRIM No. 1045—was based on language and analysis in *People v. White* (1986) 179 Cal.App.3d 193 (*White*). In *White*, the defendant was convicted of violating section 289, subdivision (a), forcible penetration of the anus by a foreign object for the purpose of sexual arousal, gratification, or abuse. At trial, White testified that he became upset when changing the diaper of his girlfriend's 17-month-old daughter. He claimed he did nothing sexual in angrily spanking her, possibly penetrating her anus. The prosecutor argued that, even if defendant's testimony were true, his angry penetration of the child's anus constituted sexual abuse under section 289. (*Id.* at pp. 197, 203-204.)

The Court of Appeal affirmed, holding that "sexual abuse" under section 289, as distinguished from sexual arousal and sexual gratification, does not require a sexually motivated intent. (*White, supra,* 179 Cal.App.3d at pp. 204-206.) Rather, the court found that sexual abuse applies more broadly to conduct involving a victim's "sexual or 'private' parts" where the intent is " 'in fact to "abuse," i.e., to hurt, cause pain or injure.' " (*Id.* at p. 205.) The court explicitly agreed with respondent in *White* that " 'when a penetration is accomplished for the purpose of causing pain, injury or discomfort, it becomes sexual abuse, even though the perpetrator may not necessarily achieve any sexual arousal or gratification whatsoever.' (Fn. omitted.) [¶] We are persuaded that respondent's view of the law is correct and that it is the only interpretation of 'sexual abuse' that is reasonable." (*Ibid.*)

Defendant argues that, in quoting from the respondent's arguments in its opinion, the *White* court intended to agree with the Attorney General that "the 'sexual' character of the abuse comes from the body part involved, not a lewd intent," but did not intend to endorse a broad definition of abuse as encompassing the intent to cause mere "discomfort." Defendant seizes on *White's* use of the phrase "injure or hurt badly" (*White, supra,* 179 Cal.App.3d at p. 205) in another part of the opinion to argue that the term "abuse" requires substantial adverse impact on the victim. Defendant also relies on

13

dictionary definitions of the terms "abuse" and "discomfort" to bolster its argument; "abuse" typically means " 'to injure, hurt or damage,' " while "discomfort" commonly describes a " 'trivial or minor experience of being 'uncomfortable or uneasy.' "

We reject defendant's constricted reading of *White* and his contention that the trial court misinstructed the jury by giving a legally incorrect statement of the specific intent required by section 289. *White*'s definition of sexual abuse to include causing "discomfort" (*White, supra,* 179 Cal.App.3d at p. 205) was incorporated into CALJIC No. 10.30[5] shortly after *White* was decided, and thereafter into CALCRIM No. 1045. Defendant has brought to our attention no case law criticizing *White* or either form instruction on this point since *White* was decided 29 years ago. Moreover, "discomfort," commonly defined as "an uncomfortable or painful feeling in the body," is not necessarily trivial or minor. (http://www.Merriam-Webster.com/dictionary/discomfort.) Nor are dictionary definitions of abuse limited to acts that cause injury or substantial pain. The common definitions of abuse include "to put to a bad use," "take unfair or undue advantage of," "to use or treat so as to injure, hurt, or damage," "maltreat," and "treat in a harsh or harmful way." (Webster's 3d New Internat. Dict. (2002) p. 8; http://www.Merriam-Webster.com/dictionary/abuse.)

Dictionary definitions aside, in our view, the term "[p]enetration for *sexual abuse*" as defined in CALCRIM No. 1045 appropriately includes the "purpose of causing . . . discomfort" in addition to the purpose of causing pain or the purpose of causing injury. In *White*, the court distinguished sexual penetration that would not violate the statute because it was done for a permissible purpose and not to arouse, gratify or abuse, such as "insertion of a thermometer or a suppository or other medicine." (*White*, *supra*, 179 Cal.App.3d at p. 205.) The range of such permissible purposes for sexual penetration would seem to be narrow. We decline to read "[p]enetration for *sexual abuse*" under

---

[5] CALJIC No. 10.30 provides, in pertinent part: "The 'specific intent to cause sexual abuse,' as used in this instruction, means a purpose to injure, hurt, cause pain or cause discomfort."

*White* or section 289 as requiring a heightened intent to cause substantial harm to the victim in the form of pain or injury.

In any event, any instructional error was harmless under any standard.  (*Chapman v. California, supra,* 386 U.S. 18; *People v. Watson, supra,* 46 Cal.2d at p. 836.) Differding testified that when defendant put his fingers inside her vagina, he seemed to reach all the way up to her stomach and that her pain was "so bad."  Differding felt pain in her vagina for a week after the incident, and it "hurt to go to the bathroom."  We find the evidence was overwhelming in support of the jury's  finding of "penetration for the purpose of causing pain [or] injury" (CALCRIM No. 1045), and not merely "discomfort."  Under any reasonable definition of abuse, defendant's conduct was abusive.

C.      *The Flight Instruction.*

Defendant argues his convictions must be reversed because the trial judge gave a jury instruction regarding evidence of flight that was argumentative and favored the prosecution.  Defendant contends the instruction invited the jury to consider whether evidence of flight reflected consciousness of guilt, but without reference to defendant's possible innocence.  Defendant contends the instruction lightened the prosecution's burden of proving each element of each offense beyond a reasonable doubt, and thus violated his right to a fair trial.  This argument is meritless.

Section 1127c provides:  "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:  [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence.  The weight to which such circumstance is entitled is a matter for the jury to determine.  [¶] No further instruction on the subject of flight need be given."

The jury instruction at issue—CALCRIM No. 372—is based on section 1127c. The trial court instructed the jury as follows:  "If the defendant fled or tried to flee

15

immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

A trial court must refuse an argumentative jury instruction. (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) "A jury instruction is argumentative when it is ' "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." [Citations.]' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 380.)

Appellate courts have upheld the constitutionality of CALCRIM No. 372, finding it an unbiased statement of the law that does not unduly favor the prosecution. (*People v. Paysinger* (2009) 174 Cal.App.4th 26 (*Paysinger*); *People v. Rios* (2007) 151 Cal.App.4th 1154 (*Rios*).) In both *Paysinger* and *Rios*, the defendants claimed that CALCRIM No. 372 presumed the defendant's guilt, lowered the prosecution's burden of proof, and deprived the defendant of a jury verdict. In rejecting the contention that CALCRIM No. 372 impermissibly invites the jury to infer guilt, the *Paysinger* court explained: "It has long been accepted that if flight is significant at all, it is significant because it may reflect consciousness of guilt, which in turn tends to support a finding of guilt. [Citation.] That CALCRIM No. 372 tells the jury this does not in any way make the instruction unconstitutional." (*Paysinger, supra*, 174 Cal.App.4th at pp. 31-32.) The *Rios* court relied on California Supreme Court precedent upholding the constitutionality of section 1127c and the predecessor flight instruction, CALJIC No. 2.52.[6] (*Rios, supra*, 151 Cal.App.4th at pp. 1158-1159; see *People v. Navarette* (2003) 30 Cal.4th 458, 502; *People v. Mendoza* (2000) 24 Cal.4th 130, 179.) Our Supreme Court has repeatedly

_____

[6] CALJIC No. 2.52 provides: "The [flight] [attempted flight] [escape] [attempted escape] [from custody] of a person [immediately] after the commission of a crime, or after [he] [she] is accused of a crime, is not sufficient in itself to establish [his] [her] guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

rejected similar challenges to CALJIC No. 2.52. (See, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 691, and cases cited therein.) The court's reasoning in these cases applies equally to this challenge to CALCRIM No. 372.

Defendant's argument focuses entirely on the deficiencies in the first sentence of CALCRIM No. 372, but the propriety of jury instructions is determined from " 'the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Jeffries* (2000) 83 Cal.App.4th 15, 22.) The first sentence of the instruction refers to an inference that flight "may show" that the defendant was "aware of his guilt." However, the instruction does not presume a defendant's guilt. Nor does it require the jury to find that a defendant in fact fled the scene or direct that a particular inference be drawn. Rather, the instruction is phrased in permissive and conditional, not mandatory terms, such as "[i]f the defendant fled," "[i]f you conclude," and "it is up to you to decide . . . ." (CALCRIM No. 372.) The instruction informed the jury that it could consider evidence of flight along with all the other evidence, and should give the evidence whatever meaning and weight the jury deemed appropriate. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183.) The instruction also emphasized that evidence of flight was not alone sufficient to establish guilt: "The cautionary nature of the [flight] instruction[] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

The trial court also gave standard instructions on the presumption of innocence, direct and circumstantial evidence, the prosecution's burden of proof, and the standard of proof beyond a reasonable doubt, in addition to CALCRIM No. 200, which cautioned the jurors: "Pay careful attention to all of these instructions and consider them together. . . . [¶] . . . [¶] . . . Do not assume just because I give a particular instruction that I am suggesting anything about the facts." These instructions ensured that the flight instruction did not undermine the presumption of innocence or lower the prosecution's burden to prove each element of each offense beyond a reasonable doubt.

Defendant attempts to distinguish CALCRIM No. 372 from CALJIC No. 2.52 on the basis that, in only identifying the inference favorable to the prosecution, CALCRIM No. 372 strays too far from the language of section 1127c. Defendant contends CALJIC No. 2.52 is unobjectionable because it refers to flight as evidence that a jury could consider in deciding "guilty or not guilty." We disagree. There is no material difference between CALJIC No. 2.52 and CALCRIM No. 372. Both instructions identify the permissible inference that could be drawn if the jury were to find the defendant fled the scene, inform the jury that the meaning and weight to accord the evidence of flight is for the jury to decide; and make clear that evidence of flight without more is insufficient to establish a defendant's guilt. The flight instruction given in this case was not argumentative.

D. *Cumulative Error*.

Defendant contends that even if none of the alleged instructional errors individually requires reversal, the cumulative prejudice of those errors requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) We have rejected each claim of instructional error and found them harmless when considered separately. Considered together, we find no prejudice and reject the claim. (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

II. *Sufficiency of the Evidence of False Imprisonment*.

Defendant contends the evidence is insufficient to sustain his conviction of false imprisonment because there was no evidence that Differding was prevented from leaving the bathroom. We disagree.

We view the record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Id.* at p. 690.) We do not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) If the circumstances reasonably justify

18

the trier of fact's findings, reversal is not warranted merely because the circumstances might also reasonably justify a contrary finding. (*Id.* at p. 639.)

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "[T]he essential element of false imprisonment is restraint of the person. Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment. (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 717.)" (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123.) " ' " 'The wrong may be committed by acts or words, or both, and by merely operating upon the will of the individual or by personal violence, or both . . . .' " ' " (*People v. Fernandez, supra*, 26 Cal.App.4th at p. 717.) "False imprisonment is a felony if it is effected by violence or menace. (§ 237.)" (*People v. Bamba, supra*, 58 Cal.App.4th at p. 1123; *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1360.)

Here, there is substantial evidence that defendant's conduct in pinning Differding down on the floor and against the wall in the bathroom compelled her to remain where she did not wish to remain. Defendant followed Differding into the bathroom shouting obscenities at her, pushed her to the floor, and slapped her face several times. Differding struggled and screamed at him to stop, but he lay on top of her, pinning her down. When she was able to get up, defendant pushed her into the bathtub and then pinned her against the wall with a forearm across her throat. Differding resisted him, screaming, "Stop, stop, stop, stop." Eventually, defendant lowered his arm and stood in the bathroom panting. Differding left the bathroom, found her keys and phone, and left the house. This is sufficient evidence that defendant made Differding stay in the bathroom against her will.

Defendant argues that Differding voluntarily entered the bathroom and never testified that she was unable to leave the bathroom or even that she wished to do so. Defendant acknowledges Differding's testimony that she struggled against defendant as he pinned her down twice and forcibly penetrated her vagina twice, but contends that she "would not have exited the bathroom even absent that restraint." The argument is

19

meritless. It is apparently based on Differding's testimony that when defendant finally stopped struggling with her and stood there panting, she remained on the bathroom floor, "like I was trying to protect myself, if he was going to come at me again," before she left the bathroom. It makes no difference that Differding went into the bathroom of her own volition. Nor does it matter that Differding briefly remained in the bathroom after defendant let go of her throat. The circumstances reasonably justify the jury's finding that Differding did not remain in the bathroom by choice after defendant came in yelling and physically abusing her. (See *People v. Dominguez* (1997) 38 Cal.App.4th 410, 421.)

III.    *The Sentence for False Imprisonment*.

Defendant contends that even if the false imprisonment conviction is supported by substantial evidence, the trial court erred in imposing dual punishment for both that count and forcible sexual penetration (count 1) because the restraint was perpetrated for the single objective of the sexual assault. We agree.

Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "Where the commission of one offense is merely ' "a means toward the objective of the commission of the other," ' section 654 prohibits separate punishments for the two offenses." (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1215, called into doubt on another ground by *People v. Calderon* (2013) 214 Cal.App.4th 656, 666-667.)

" 'The defendant's intent and objective are factual questions for the trial court . . . .' [Citation.] When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial

20

court is deemed to have made an implied finding each offense had a separate objective. [Citation.] 'A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.' " (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

The trial court did not make an express finding that defendant entertained a separate objective in committing false imprisonment. We do not find substantial evidence to support such a finding. Defendant committed the offense of false imprisonment by physically restraining Differding and preventing her from leaving the bathroom. The prosecutor argued that "[t]he defendant held the victim down and prevented the victim from getting up, and putting his body against her. He made the person stay or go somewhere else against that person's will. She was restrained from leaving the bathroom. Every time she struggled against him, he was preventing her from going or staying. He was preventing her from leaving that bathroom." The purpose of defendant's conduct, as argued by the prosecutor, was to humiliate and hurt her: "He's so angry with her that morning, he's so angry, because he so believes that she's cheating on him that, when she's crying in the bathroom, because she can't get her keys and she needs to go to work, he comes in and he assaults her, and he violates her, penetrating her vagina, and making her smell his fingers." "He is saying, 'See? I'm proving to you that I know what you did.' " We do not discern an intent or objective on defendant's part other than to sexually assault Differding. Defendant restrained her in order to accomplish this objective.

The Attorney General argues that a separate sentence for false imprisonment is permissible here because, although the evidence showed that defendant pinned Differding twice and penetrated her twice, once on the floor and once against the wall in the bathtub, the jury convicted defendant of only one of the two charged counts of unlawful sexual penetration. According to the Attorney General, the other pinning is substantial evidence of a separate false imprisonment. We disagree.

21

First, it is not possible to tell from the record which incident in the bathroom was the basis for the section 289 conviction.[7] Second, we are not persuaded that defendant's conduct is divisible into separate acts of false imprisonment. Third, there is still insufficient evidence that defendant had a separate criminal objective for restraining Differding in the bathroom other than to sexually assault her. (Cf. *People v. Saffle* (1992) 4 Cal.App.4th 434, 439-440 [false imprisonment after the sex offenses was to further the separate objective of dissuading a witness].) Accordingly, pursuant to section 654, separate punishment for false imprisonment may not be imposed and we will order that sentence to be stayed.

IV.     *The Protective Order*.

Defendant contends the domestic violence protective order issued by the court to keep him away from Differding contained no expiration date and thus was statutorily unauthorized and should be stricken. The Attorney General argues that the order has expired as a matter of law and no action by this court is necessary.

On June 27, 2011, the trial court issued a criminal protective order pursuant to section 136.2 prohibiting defendant from coming within 100 yards of Differding. The order was prepared on the standard Judicial Council form No. CR-160 (form CR-160). Item 2 on the face of the order reads as follows: "This order expires on (date): _____. If no date is listed, this order expires three years from the date of issuance." The reverse side of the order lists a number of preprinted "WARNINGS AND NOTICES." Paragraph six of the Warnings and Notices is entitled "EFFECTIVE DATE AND EXPIRATION DATE OF ORDERS." The third subparagraph under this heading states: "Orders under Penal Code section 136.2 are valid as long as the court has jurisdiction

---

[7] Neither the verdict forms nor the jury instructions drew a distinction as to which incident of alleged forcible penetration was covered by count 1 and count 2 (i.e., on the bathroom floor or in the bathtub). However, the jury was instructed that the People had to prove specifically that the defendant committed that offense or those offenses on June 23, 2011, and they had to all agree on which act or acts he committed.

22

over the case. They are not valid after imposition of a state prison commitment. (See *People v. Stone* (2004) 123 Cal.App.4th 153.)"

The record also contains clerk's minutes stating summarily that the trial court cancelled and reissued the protective order on July 6, 2011.

Whether the protective order was authorized is a matter of statutory interpretation subject to de novo review. (*Babalola v. Superior Court* (2011) 192 Cal.App.4th 948, 956.)

Section 136.2, subdivision (a), at the time of defendant's conviction, provided in part: "Except as provided in subdivision (c), upon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur, a court with jurisdiction over a criminal matter may issue orders, including, but not limited to, the following: [¶] . . . [¶] (7)(A) An order protecting victims of violent crime from all contact by the defendant, or contact, with the intent to annoy, harass, threaten, or commit acts of violence, by the defendant."[8]

"Although section 136.2 does not indicate on its face that the restraining orders it authorizes are limited to the pendency of the criminal action in which they are issued or to probation conditions, it is properly so construed. It authorizes injunctions only by courts with jurisdiction over criminal proceedings and is aimed at protecting only 'victim[s] or witness[es],' an indication of its limited nature and focus on preserving the integrity of the administration of criminal court proceedings and protecting those participating in them. . . . The narrower scope of section 136.2 suggests that the Legislature did not intend it to authorize restraining orders beyond those germane to the proceedings before the criminal court." (*People v. Stone*, *supra*, 123 Cal.App.4th at p. 159; see also *People v. Ponce* (2009) 173 Cal.App.4th 378, 383.) The purpose of the statute "is to protect victims and witnesses in connection with the criminal proceeding in

_____

[8] The statute was amended in 2013, but those amendments do not affect the substance of our discussion.

which the restraining order is issued in order to allow participation without fear of reprisal." (*People v. Stone*, *supra*, 123 Cal.App.4th at p. 159.)

Defendant takes issue with the order issued in his case and with form CR-160 itself. Although defendant was sentenced to state prison on April 22, 2013, he argues that the order could have been enforced against him erroneously until either June 27, 2014, or July 6, 2014, three years from the date of issuance, because it contained no expiration date on its face and was presumptively valid for three years. The argument is moot. As noted above, the order states that it is valid "as long as the court has jurisdiction over the case," and specifically, that it is not valid "after imposition of a state prison commitment." Thus, the order expired on April 22, 2013 as a matter of law. Even with an expiration date three years from the date of issuance, i.e., June 27 or July 6, 2014, the order has expired.

Defendant acknowledges the mootness problem with respect to his own claim, but contends the ambiguity regarding expiration of the order pursuant to item two on the front page (three years) and the validity of the order pursuant to the third subparagraph of paragraph six on the back page (valid as long as the court has jurisdiction; not valid after imposition of state prison commitment) is "an important issue that is likely to recur, yet evade review." (*Schraer v. Berkeley Property Owners' Association* (1989) 207 Cal.App.3d 719, 728.) We interpret defendant's argument as requesting we hold that a protective order under section 136.2 must expressly state a specific expiration date.

We see no need to take the action defendant seeks. Form CR-160 is used for criminal protective orders statewide under several statutes. The form clearly states, consistent with section 136.2, that an order issued under that section is not valid after imposition of a state prison commitment. The potential harm suggested by defendant, namely, erroneous extension and enforcement of an order beyond the date of commitment, is speculative and provides no basis for us to issue what would amount to an advisory opinion.

24

**DISPOSITION**

The judgment is modified to stay the two-year concurrent sentence on false imprisonment, count 4, pursuant to section 654. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.

_____
Miller, J.

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

25